**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CORNERSTONE INVESTMENT FCV LP, CORNERSTONE INVESTMENT GP LLC, and BPGC MANAGEMENT, L.P.,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN C. HOERAUF,<br><br>Defendant. | Civil Action No. ________________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Cornerstone Investment FCV LP ("Cornerstone"), Cornerstone Investment GP LLC ("Cornerstone GP"), and BPGC Management, L.P. ("BPGC," collectively with Cornerstone and Cornerstone GP, the "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against Defendant Ryan C. Hoerauf ("Defendant" or "Hoerauf"). In support of this action, Plaintiffs state as follows:

## SUMMARY OF THE ACTION

1. In December 2024, Cornerstone purchased 58,000 shares of a closely held Delaware private company, PB Materials Holdings, Inc. ("PBM"), which produces concrete and construction aggregates in Odessa, Texas. Plaintiff Cornerstone GP is the general partner of Cornerstone. The seller was a limited partnership owned and controlled by Defendant that held 64,000 PBM shares in total. Cornerstone paid $4,612,406.00 for the 58,000 shares as part of a larger transaction to make Cornerstone PBM's majority shareholder.

2. In addition to being a shareholder, Defendant served as a director of PBM before, during, and after the sale to Cornerstone.

3. Throughout this period, PBM's shareholder agreement restricted the transfer or pledge of the shares without satisfying various conditions, including providing notice to PBM and its majority shareholder, and offering the majority shareholder a right of first refusal on the same terms as the proposed transfer or pledge.

4. Unbeknownst to Cornerstone, Defendant had years earlier obtained a bank loan that grew to exceed $50 million by February 2025. When the loan's original collateral sharply diminished in value, the bank demanded additional security. Defendant responded by purporting to pledge all 64,000 PBM shares, falsely representing to the bank that the shares bore no transfer restrictions while failing to notify PBM or its majority shareholder of the improper pledge. By deceiving both sides, Defendant ensured the bank would not learn of the transfer restrictions and PBM would not learn of the pledge.

5. By 2024, Defendant's financial condition had deteriorated significantly. He missed a scheduled loan payment as early as October 2022, failed to repay the loan at its April 2024 maturity, missed another interest payment in June 2024 after the bank extended the maturity to September 2024, and again failed to satisfy the loan at the extended maturity date. The bank issued a formal notice of default in October 2024.

6. In early December 2024, Defendant and related borrower and guarantor entities entered into a forbearance agreement with the bank, agreeing, among other things, to obtain a purchase and sale agreement for a large piece of real property as a condition of the forbearance. At no point did Defendant disclose the forbearance agreement or his loan default to Plaintiffs or PBM's other shareholders; instead, he continued to participate actively in PBM's management as if nothing were amiss.

7. Defendant failed to meet the forbearance terms. Days later, the bank terminated the agreement, demanded immediate repayment of the then outstanding $48 million balance, and advised Defendant that it intended to foreclose on his collateral, beginning with a Texas ranch and the 64,000 pledged PBM shares.

8. Desperate to avoid foreclosure and having concealed the pledge from PBM and its shareholders, Defendant made an eleventh-hour decision to force the sale of 58,000 of the 64,000 shares to Cornerstone as part of the broader transaction scheduled to close by December 31. Defendant had previously told Cornerstone he intended to retain all of his shares, and that representation then became a requirement under the broader transaction agreement. He then threatened to vote against the transaction unless he was able to sell those 58,000 shares. So Cornerstone scrambled to accommodate the sale by upsizing the new term loan, still with no knowledge of the encumbrance.

9. Rather than directing Cornerstone to wire the sale proceeds to the bank—as required under the pledge agreement—Defendant deliberately routed the $4.6 million to a separate investment account held through another entity he controlled. This action ensured that the bank would not learn of the transaction. Had the proceeds gone to the bank, it would have discovered Cornerstone's involvement and its interest in the shares could have been resolved. Instead, Defendant diverted the funds for his own purposes, including making an interest payment on the bank loan, leaving Cornerstone unaware of the existing lien and exposing Plaintiffs to the resulting harm.

10. Still, Defendant could not hold off the bank's enforcement of the loan for long. Within weeks, the bank threatened to force a sale of the loan's collateral, beginning with the shares and the Texas ranch. To forestall these sales, Defendant filed voluntary bankruptcy petitions on

behalf of various entities he owned and controlled in early 2025. He told PBM that he had resolved the bank's action on the shares and that there was nothing to worry about. He then ensured that Plaintiffs were excluded from the creditor matrix, received no notice of the filings or critical hearings, and could not assert their interest in the PBM shares—despite Cornerstone's payment of $4,612,406 only weeks earlier. Due to Plaintiffs' exclusion from the bankruptcy, they were prevented from protecting their interest in the PBM shares and the bank retained its claims to liens on the shares while the sale proceeds funded the bankruptcy expenses.

11. In the summer of 2025, while the bankruptcy was pending, Plaintiffs retained an investment bank to work with several parties who had expressed interest in an acquisition of PBM. PBM eventually received an offer to purchase all of its stock for $450 million in the fall of that year. During the ensuing negotiations, Plaintiffs first learned of Defendant's prohibited pledge of the 64,000 shares. The purported lien arising from the pledge, which survived the bankruptcy of Defendant's entities and had remained unknown to Plaintiffs until that point, directly disrupted the sale process and materially impacted the sale terms.

12. The cloud on title to the 64,000 shares that had been purportedly pledged made it impossible for Plaintiffs to consummate the transaction as a stock purchase because Plaintiffs could not deliver clean title to all of PBM's shares. Instead, the parties had to restructure the entire transaction as a merger after the stock purchase agreement had already been substantially negotiated, resulting in significant additional costs to the Plaintiffs and the other PBM shareholders.

13. In addition, Plaintiffs' inability to deliver clean title to the shares shifted the transaction's bargaining dynamics, allowing the buyer to leverage the situation and negotiate the enterprise value of PBM down from $450 million to $422 million.

14. Far from exhibiting a shred of regret or doubt about the damage his purported stock pledge would cause, Defendant exploited the confidential transaction to advance his own interests. After receiving confidential details about the potential acquisition as a PBM director, Defendant directed his counsel to share those details with the bank so that the bank could use the information to strengthen its position against Plaintiffs regarding the lien on the shares. In other words, while serving as a PBM director, Defendant put his self-interest above Plaintiffs and PBM's other shareholders while they were actively negotiating to sell their shares.

15. Plaintiffs ultimately consummated the PBM sale—albeit at a reduced value. The buyer withheld part of the proceeds and placed them in escrow to cover potential claims arising from the cloud on title to the 64,000 shares. The sale terms also required Plaintiffs, at their own expense, to clear the encumbrance.

16. Defendant's conduct was not a series of isolated missteps; it was a years-long course of self-dealing, deception, and disloyalty. He secretly encumbered shares he had no right to pledge, lied to the bank about the restrictions on those shares, concealed the pledge from PBM and its shareholders, deliberately diverted (or at least initially attempted to) sale proceeds away from the bank to avoid detection, and then—exploiting his director position—weaponized confidential information about PBM's pending $450 million sale to serve his own interests at the selling shareholders' expense.

17. Plaintiffs bore the full cost of these consequences: the transaction had to be restructured as a merger after the stock purchase agreement was substantially negotiated; the enterprise value was reduced by $28 million; a portion of the sale proceeds was withheld in escrow; and some of that escrow was ultimately used to pay the bank to release liens on shares Cornerstone had already purchased. Plaintiffs also spent considerable time and resources litigating the validity

of an encumbrance created entirely (and impermissibly) by Defendant. In short, Plaintiffs absorbed almost all the harm so that PBM would suffer none. Meanwhile, Defendant received a non-ratable benefit not shared by Plaintiffs or any other stockholder: the encumbrance dispute allowed him to extract a larger payout to the bank—to which his entities still owed more than $50 million—which might reduce his entities' own outstanding debt. Plaintiffs bring this action to recover the full measure of their damages and to hold Defendant accountable for each of these wrongs.

## **THE PARTIES, JURISDICTION, AND VENUE**

18. Plaintiff Cornerstone is a Delaware limited partnership.

19. Plaintiff Cornerstone GP is a Delaware limited liability company and general partner of Cornerstone.

20. Plaintiff BPGC is a Delaware limited partnership and is the sole member of Cornerstone GP.

21. Defendant Ryan Hoerauf is an individual who resides in San Angelo, Texas. Defendant served as a director of PBM during the relevant period and, as such, consented to personal jurisdiction in Delaware under 10 *Del. C.* § 3114(a).

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States, including 18 U.S.C. §§ 1961-68. The Court has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

23. Venue is proper in this Court pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).

## STATEMENT OF FACTS

**A. To ensure the company remained closely held, PBM's shareholders agreed to restrict the transfer of PBM shares.**

24. PBM is a closely held Delaware company engaged in the production of concrete and construction aggregates based in Odessa, Texas. PBM was formed in 2013 through the combination of three predecessor concrete and aggregates businesses: Crockett County Mining Venture No. 1, Ltd., Highland Concrete Co., and Wallach Concrete, Inc. Defendant had ownership interests in both Crockett County Mining and Highland Concrete before PBM's formation.

25. In connection with PBM's formation, WLR Recovery Fund V, L.P., WLR V Parallel ESC, L.P., and WLR Select Co-Investment L.P. (collectively, "WLR") acquired an approximately 80% equity stake in the company. As an owner of the Crockett County Mining and Highland Concrete predecessor interests, Defendant received 64,000 shares of PBM common stock at its inception in exchange for the contribution of his predecessor interests. Defendant received these shares through O'Ryan Production and Exploration, LTD, a limited partnership owned and controlled by Defendant ("O'Ryan LP").

26. PBM is managed by a board of directors. At its inception, the PBM board consisted of five directors. Defendant was designated as the "Crockett/Highland Designee" on the PBM Board pursuant to Section 2.1.1 of the stockholders' agreement dated October 2, 2013 (the "Stockholders' Agreement" or "SA").[1] Defendant served as one of the five directors on the PBM Board from the execution of the Stockholders' Agreement in October 2013 through November 8, 2025.

[1] A true and correct copy of the Stockholders' Agreement is attached hereto and incorporated herein as "Exhibit A."

27. Throughout his tenure on the PBM Board, Hoerauf received nonpublic financial and strategic information about PBM's operations, capital structure, and business plans and participated actively in board meetings. Section 2.2 of the Stockholders' Agreement expressly provides that nothing in the agreement shall relieve any officer or director of PBM of any fiduciary or other duties to PBM's stockholders.

28. On or around October 2, 2013, O'Ryan LP entered into the Stockholders' Agreement, which was by and among PBM, WLR, and other minority shareholders of PBM like O'Ryan LP.

29. Defendant signed the Stockholders' Agreement on behalf of the O'Ryan LP as President of Ryan E & P Management, Inc., General Partner of the O'Ryan LP.

30. The Stockholders' Agreement contained customary restrictions (the "Transfer Restrictions") that prohibited any purported transfer of the PBM shares unless it complied with certain conditions, including:

a. the provision of advance written notice to WLR and PBM (SA § 5.3(a));

b. the provision of an opinion (or evidence reasonably satisfactory) to PBM that the transfer does not affect any registration requirements under the Securities Act of 1933 (SA § 5.3(b));

c. the transferor agrees in writing to hold the PBM shares subject to the provisions and upon the conditions specified in the Stockholders' Agreement (SA § 5.1.1); and

d. the transferred stock certificates contain the legend that the PBM shares are subject to the terms and conditions of the Stockholders' Agreement and not registered under the Securities Act of 1933 (SA §§ 5.2.1[2], 5.2.3[3]).

31. For most transfers to unaffiliated third parties, the Stockholders' Agreement required any stockholder not affiliated with WLR to provide notice of the proposed transfer and grant WLR and its affiliates a right of first refusal on the same terms. WLR had sixty (60) days to elect whether to purchase the shares. Neither Defendant nor O'Ryan LP was affiliated with WLR, and both were subject to this additional transfer restriction.

32. The Stockholders' Agreement broadly defines "Transfer" to expressly include a "pledge" of PBM shares:

---

[2] Section 5.2.1 of the Stockholders' Agreement required that the PBM Shares be stamped with the following legend:

> THE SECURITIES OF THIS COMPANY REPRESENTED BY THIS CERTIFICATE MUST BE ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE STATE SECURITIES LAWS OF ANY STATE. WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED AT ANY TIME WHATSOEVER, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE COMPANY TO THE EFFECT THAT ANY SUCH TRANSFER WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS, OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.

[3] Section 5.2.3 of the Stockholders' Agreement required that the PBM share certificates be stamped with the following other legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN OPTION TO PURCHASE, RESTRICTIONS ON TRANSFER, VOTING AND OTHER TERMS AND CONDITIONS SET FORTH IN THE STOCKHOLDERS' AGREEMENT, DATED AS OF OCTOBER 2, 2013, A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

> "Transfer" means… any direct or indirect sale, transfer, **pledge**, hypothecation, assignment, gift, conveyance or other disposition of any direct or indirect legal or beneficial rights or interest as to any Security…" [emphasis added].

SA § 1.1 (emphasis added).

33. These customary restrictions are critical in closely held companies like PBM. They allow shareholders to control who holds interests in the company, who exercises voting and information rights, and to whom the company and its officers and directors owe fiduciary duties. They are also essential to facilitating any future sale of the company—and a future sale was precisely what PBM's shareholders had spent years working toward. For many years, PBM had sought to grow its business to a point that would attract a prospective buyer.

**B. Defendant obtained a sizeable loan from the Bank that increased over time.**

34. PBM was not Defendant's only business interest. In May 2007, Defendant, on behalf of his various businesses and his children's trusts, obtained a $30 million loan from Amarillo National Bank (d/b/a Lone Star Loan Production Office) (as amended, restated, and supplemented from time to time, the "Loan"), consisting of a $3.5 million term note and $26.5 million in revolving lines of credit. The Loan was originally secured by oil and gas interests in eight Texas counties, life insurance proceeds, and certain contract rights including hedging agreements.

35. Defendant guaranteed the initial Loan along with Ryan C. Hoerauf Inc. and Ryan Properties Inc. Numerous entities were added or removed as guarantors over the life of the Loan.

36. Over the next seven years, the Loan grew substantially. By March 2014, the separate borrower facilities were consolidated into a single $51.5 million revolving line of credit. At that time, Lone Star State Bank of West Texas ("Lone Star") served as lead lender until it was succeeded by Prosperity Bank ("Prosperity," and collectively with Lone Star, the "Bank") on April 1, 2024. Over time, the collateral package expanded to include a broad all-asset security interest,

Louisiana oil and gas properties, Texas oil and gas assets in Henderson and Navarro Counties, and a $25 million Community National Bank note.

37. After oil prices fell from 2015 to 2016, the Bank began seeking additional collateral to secure the Loan and Defendant, on behalf of his various borrowing entities, agreed to pledge additional collateral, including a 1,739-acre ranch in Llano County, Texas, in 2016.

**C. O'Ryan LP pledges PBM stock in violation of the Stockholders' Agreement and falsely tells the Bank the shares do not have transfer restrictions.**

38. In March 2018, Defendant added (or at least first attempted to add) the PBM shares to the collateral package. Acting as President of O'Ryan LP's general partner, he executed a pledge agreement with the Bank purporting to pledge all of O'Ryan LP's membership interest in Permian Basin Materials, LLC, a Delaware limited liability company, as collateral for the Loan, effective as of February 4, 2018. Defendant was a personal guarantor of the Loan at the time.

39. About a year later, Defendant—on behalf of O'Ryan LP—entered into an Amended and Restated Pledge Agreement dated February 28, 2019, but effective as of February 4, 2018 (the "Pledge Agreement").[4] Defendant entered into the agreement in his capacity as the President of Ryan E&P Management, Inc., the General Partner of O'Ryan LP. The Pledge Agreement was amended to identify PBM, which had previously been misidentified, as the correct entity, with a purported pledge of all 64,000 shares of PBM common stock (the "Purported Pledge"). Defendant remained a personal guarantor of the Loan.

40. In the Pledge Agreement, Defendant represented and warranted that:

> there are ***no restrictions upon the transfer of any of the Collateral,*** other than as may appear and may be referenced on the face of any certificates, may be referenced in the governing documents of the Borrower or other than arising under applicable state or federal securities laws.

---

[4] A true and correct copy of the Pledge Agreement is attached hereto and incorporated herein as "Exhibit B."

Defendant further represented and warranted that:

> neither the making of this Agreement, nor the exercise of any rights or remedies of Pledgee hereunder will cause a default under any operating agreement, company agreement, partnership agreement, bylaws or any other organizational document of the Borrower.

Pledge Agreement, Section 2(ii), (ix). Like much of what Defendant did and said in connection with this case, his representations were an outright lie. The Stockholders' Agreement expressly required advance written notice to both WLR and PBM, plus satisfaction of multiple conditions, before any pledge of PBM stock could be effected. Hoerauf apparently never provided that notice and never satisfied those conditions. The Pledge Agreement was submitted to the Bank,[5] a federally insured financial institution, for the purpose of obtaining and maintaining the Bank's acceptance of the PBM shares as first-priority collateral, thereby obtaining funds and credit from the Bank through false and fraudulent pretenses. ("PA-1," Bank Fraud).

41. Relying on the Pledge Agreement and Defendant's representations, the Bank recorded a UCC-1 financing statement with the Texas Secretary of State on April 12, 2019, listing O'Ryan LP as debtor and the Bank as secured party, and describing the collateral as encompassing all of O'Ryan LP's ownership interest—expressly referencing all 64,000 PBM shares. Defendant caused this filing to be made and publicly recorded by the Bank, which purported to establish a perfected, first-priority lien on the shares, even though Hoerauf knew the underlying pledge was void or voidable under the Stockholders' Agreement. ("PA-2," Wire Fraud and/or Mail Fraud).

42. The Stockholders' Agreement did not merely restrict but *actually barred* pledging the PBM shares without satisfaction of the conditions described above, including notice to PBM and WLR. Defendant satisfied none of those conditions.

[5] Lone Star was the lead lender at the time the parties entered into the Pledge Agreement.

43. The Pledge Agreement included a form for PBM to acknowledge and consent to the Purported Pledge. Unsurprisingly, given the restrictions in the Stockholders' Agreement and the fact that PBM was utterly in the dark regarding the Purported Pledge of the PBM shares, Defendant never obtained, and in fact never even attempted to obtain, PBM's signature on the consent form.

44. Because of Defendant's misrepresentations to the Bank, the Bank later asserted a purported lien over the 64,000 PBM shares. The UCC-1 remained of record and contributed to the cloud on title that prevented a later transaction from proceeding as originally intended, and as set forth more fully below.

**D. Defendant struggled to comply with the Loan documents but never informed PBM of his prohibited pledge of PBM shares even as default under the Loan became imminent.**

45. Within months of executing the unauthorized Pledge Agreement, Defendant and his borrowing entities were already struggling to comply with the Loan's covenants.

46. In April 2020, O'Ryan Ranches LLC pledged a ranch in Crook County, Oregon as additional collateral for the Loan, and a COVID-19-related maturity extension followed in May 2020.

47. On January 2, 2021, O'Ryan Ranches LLC and O'Ryan Oregon Ranches, LLC executed a deed of trust pledging the Oregon Ranch to the Bank.

48. In January 2021, the Loan was restated at approximately $51.5 million. Prior guarantors—including Defendant, Ryan C. Hoerauf, Inc., Ryan Properties, Inc., O'Ryan Ranches, Ltd., EON Production, LLC, O'Ryan Oregon Ranches, LLC, and O'Ryan Ponderosa LLC—along with O'Ryan Ranches, LLC, became borrowers. The Ryan C. Hoerauf 2008 Delaware Trust was the sole remaining guarantor.

49. Additional Loan maturity extensions followed in November 2021 and February 2022.

50. The Loan facility was restated for the final time on April 1, 2023 (the "Loan Agreement"), at a principal balance of $48,973,536.40, with express cross-default and cross-collateralization provisions across various security documents.

51. By that point, the Bank's collateral package included the PBM shares, partnership interests, the Oregon and Llano Ranches, additional real property, and Texas oil and gas leases, interests, equipment, and proceeds.

52. The borrowers failed to make the Loan payment scheduled for October 1, 2022, and then could not pay the Loan off when it matured on April 1, 2024. On that same day (April 1), Prosperity succeeded Lone Star pursuant to a merger of those entities.

53. The Bank extended the Loan maturity date to September 2024. However, the borrowers missed an interest payment due June 1, 2024, and then failed to pay the Loan off at the extended September 1, 2024 maturity date.

54. By mid-September 2024, Defendant knew both that O'Ryan LP had entered into the Purported Pledge in violation of the Stockholders' Agreement and that he was in default under the Loan, entitling the Bank to seize the 64,000 shares as collateral.

55. On October 8, 2024, the Bank sent Defendant a notice of default in connection with the O'Ryan LP's unpaid Loan. Defendant and O'Ryan LP have been in continuous default under the Loan Agreement since September 2024.

**E. Cornerstone offers to buy WLR's and others' shares in PBM.**

56. As a PBM director, Defendant became aware of a proposed transaction under which WLR, PBM's former supermajority stockholder, would sell its PBM shares to Cornerstone (the "Cornerstone Transaction"). Cornerstone was formed as a continuation vehicle to provide near-

term liquidity to WLR's expiring funds. The Cornerstone Transaction, which permitted PBM to remain intact and pursue growth opportunities such as a new frac sand line of business, was entered into in anticipation of a future sale.

57. Stephen Toy, as a PBM director[6] and the corporate secretary, primarily coordinated the Cornerstone Transaction on PBM's behalf, convening board calls, circulating transaction documents, and responding to board members' questions, including Defendant's.

58. Cornerstone offered non-insider PBM shareholders a choice: sell all their shares for cash or retain them and continue as a PBM stockholder; however, at least initially, O'Ryan LP (given Hoerauf's role on the board) and other insider minority shareholders were not permitted to sell their shares.

59. As a PBM director, Defendant knew the per-share price in the Cornerstone Transaction and that the price had been established through a competitive marketing process.

60. On September 30, 2024, shortly after learning of the potential Cornerstone Transaction, Defendant emailed Mr. Toy inquiring about the value of his interest in PBM and whether it could be sold, explaining that he was looking to raise capital for a "well completion."

61. At the time of this email, Defendant knew that: (1) he and O'Ryan LP were in default under the Loan; (2) the Bank had filed UCC filings regarding the purportedly pledged PBM shares; (3) the Bank had threatened to collect all posted collateral; and (4) the Bank maintained that it held a properly perfected lien on all 64,000 PBM shares.

62. At a telephonic meeting of the PBM Board held on November 8, 2024, the board unanimously approved the Cornerstone Transaction. On the same day, Plaintiffs entered into a

[6] Under the terms of the Stockholders' Agreement, Mr. Toy was designated as one of the "WLR Group Designees" on the PBM Board.

transaction agreement with WLR (among others) in order to implement the Cornerstone Transaction.

63. Notwithstanding his knowledge about the Loan and the potential encumbrance on the 64,000 PBM shares, Defendant voted in favor of the Cornerstone Transaction.

64. As the Cornerstone Transaction progressed toward closing, Defendant failed to disclose the Loan default or the Purported Pledge. For example, in a November 29, 2024 email to Mr. Toy, Defendant demanded details about the transaction and its fees without disclosing his own default or fraudulent actions.

65. Two days later, Defendant emailed Mr. Toy regarding the Cornerstone Transaction, complaining about potential dilution of his shares while PBM still had cash on hand. Again, Defendant did not disclose the Purported Pledge, which he knew would adversely affect the Cornerstone Transaction.

**F. Defendant negotiates a forbearance agreement with the Bank while still hiding the defaulted state of the Loan and associated Pledge Agreement from Plaintiffs and PBM's other shareholders.**

66. On December 2, 2024, Defendant, O'Ryan LP, and related entities entered into a forbearance agreement under which the Bank agreed to forbear on enforcing its rights until March 31, 2025.

67. In exchange for the Bank's forbearance, Defendant, O'Ryan LP, and the other borrowers agreed to deliver to the Bank a fully executed purchase and sale agreement for the Oregon Ranch in an amount of not less than $50 million by December 15, 2024.

68. Despite serving on the PBM Board, Defendant failed to disclose to Plaintiffs or to PBM's other shareholders the forbearance agreement or his Loan default.

69. Meanwhile, Defendant continued to take an active role in the management of PBM. At a November board meeting, On December 3, 2024, Defendant inquired about truck economics and fleet planning as if nothing were amiss regarding O'Ryan LP's PBM shares.

70. Defendant failed to deliver the required purchase and sale agreement for the Oregon ranch by the December 15, 2024 deadline.

71. On the morning of December 17, 2024, PBM held an additional, in-person board meeting at the PBM corporate offices that Hoerauf attended by telephone. At the meeting, the PBM board formally approved the Cornerstone Transaction. The board had previously shared the details of the Cornerstone Transaction, including the projected value of the PBM shares within two years.

72. Later that day, the Bank terminated its December 2, 2024 forbearance agreement with Defendant and demanded immediate payment of the Loan balance.

**G. Defendant decides at the eleventh hour to sell 58,000 PBM shares to Cornerstone without telling Cornerstone about his pledge of the same PBM stock.**

73. The next morning, Defendant emailed Stephen Toy requesting a call about the Cornerstone Transaction.

74. On that December 18 call, Defendant informed Mr. Toy for the first time that he wanted to sell 58,000 of O'Ryan LP's PBM shares and retain 6,000, threatening to oppose the entire transaction unless permitted to sell. He did not disclose: (1) the Purported Pledge; (2) the termination of the forbearance agreement; (3) the Bank's stated intent to commence collection efforts; or (4) the Loan's requirement that all sale proceeds be directed to the Bank.

75. Defendant's last-minute about-face on the sale of his PBM stock was not an accident but was in direct response to the pressure the Bank applied on Defendant, including the Bank's declared intention to seize and sell his collateral. His wire communications were made for

the purpose of executing and furthering the scheme to defraud, in violation of 18 U.S.C. § 1343 ("PA-3," Wire Fraud).

**H. Cornerstone scrambles to accommodate Defendant's last-minute decision to sell.**

76. Defendant's late request for O'Ryan LP to sell 58,000 shares—and retain 6,000 shares—of PBM stock required significant accommodation that disrupted the Cornerstone Transaction, which was scheduled to close by year-end.

77. As the stockholder election deadline had already passed, it had to be extended to allow for O'Ryan LP's belated participation.

78. The original transaction structure contemplated O'Ryan LP retaining its shares and also did not contemplate any stockholder both selling and retaining PBM stock, so the transaction documents had to be revised and additional funding arranged to pay Defendant $4,612,406 for the 58,000 shares.

79. No other PBM shareholder elected to both sell and retain PBM shares. Six other PBM shareholders decided to retain all of their PBM shares in the Cornerstone Transaction without selling any of their PBM shares. Two other minority shareholders decided to sell all their shares.

80. On December 20, 2024, the PBM Board adopted a unanimous written consent authorizing Amendment No. 1 to the Transaction Agreement to accommodate Defendant's last-minute request. On December 21, Mr. Toy confirmed to the Board that Defendant would sell 58,000 shares and retain 6,000, requesting the return of signature pages to avoid delaying the year-end closing, which would have put the entire transaction in jeopardy. Amendment No. 1 was executed on December 30, 2024.

81. The next day, Defendant emailed his signed shareholder election form to Mr. Toy confirming his decision to sell 58,000 of the 64,000 shares. Defendant signed the election form as "Manager" of O'Ryan LP.

82. At no time during the Cornerstone Transaction did Defendant—then still a PBM director—inform PBM, its other shareholders, or Plaintiffs that O'Ryan LP had entered into the Purported Pledge of all 64,000 PBM shares as collateral for his then-defaulted Loan.

83. Nor did Defendant inform the Bank of the shares' transfer restrictions or his decision to sell 58,000 shares. Just as he concealed the Pledge Agreement from Plaintiffs, he concealed the Cornerstone Transaction from the Bank.

84. To conceal the Cornerstone Transaction from the Bank, Defendant directed Cornerstone to wire the sale proceeds to a separate investment account and not to O'Ryan LP's account at the Bank, as was required under the Pledge Agreement. Pursuant to Section 4 of the Pledge Agreement, O'Ryan LP had: "irrevocably authorize[d] [the Bank] at any time and from time to time, in each case after the occurrence and during the continuance of an Event of Default, in the sole discretion of [the Bank] and appoint[ed] [the Bank] as its attorney-in-fact… (ii) to endorse and collect any cash proceeds of the Collateral…, and (v) to apply the proceeds of any Collateral received [the Bank] to the Obligations as provided in the Loan Agreement."

85. Despite and in violation of his obligations under the Pledge Agreement, on December 26, 2024, Defendant emailed Mr. Toy directing him to wire the share sale proceeds of $4,612,406 to a Citibank NA NY account FBO Charles Schwab & Co., Inc. in the name of the O'Ryan Family Limited Partnership, not O'Ryan LP. O'Ryan Family Limited Partnership's general partner was Ryan Properties, Inc., another entity controlled by Defendant. Routing proceeds through this account and omitting the same material facts he had in his December 18

communications with Mr. Toy was a deliberate circumvention of Hoerauf's obligations under the Loan in violation of 18 U.S.C. § 1343 ("PA-4", Wire Fraud).

86. Had the Bank received the sale proceeds and agreed to accept them in satisfaction of its lien on the 58,000 shares, the cloud on Cornerstone's title and resulting damages would have been avoided. But Defendant directed the proceeds to a non-Prosperity account to use the money as he saw fit.

87. On December 31, 2024, the Cornerstone Transaction closed. Cornerstone wired the sales proceeds to Defendant's designated bank account on the same day.

88. At no point did Defendant disclose to PBM or Plaintiffs: (1) the Purported Pledge of PBM stock; (2) his defaults under the Loan Agreement; (3) the existence or termination of his forbearance agreement; or (4) the Bank's commencement of foreclosure proceedings against him.

89. In connection with the closing, Defendant also executed on behalf of O'Ryan LP the Stockholders' Agreement by and among PBM, Cornerstone, LGV Advisors III L.P., and other holders in connection with the Cornerstone Transaction (the "December 31, 2024 Stockholders' Agreement").

90. The December 31, 2024 Stockholders' Agreement had identical terms to the Stockholders' Agreement barring transfer—defined to include pledge—of the PBM shares other than in satisfaction of the same conditions set forth in the Stockholders' Agreement (as discussed in paragraphs 26 through 33 above).

91. Defendant never satisfied any of the transfer conditions in either the original or December 31, 2024 Stockholders' Agreement. The pledge remained prohibited under both.

### I. Defendant again diverted the proceeds of the Cornerstone Transaction in anticipation of Chapter 11 proceedings.

92. On or around January 16, 2025, Defendant directed the transfer of the $4.6 million in share sale proceeds from the Citibank account in which they were originally deposited to a newly opened VeraBank account. On information and belief, this bank account was in the name of both Defendant and O'Ryan Family Limited Partnership. The VeraBank account was opened specifically to conceal the proceeds of Defendant's PBM stock sale from the Bank.

93. Defendant subsequently used a portion of the proceeds to finance the Chapter 11 filing and transferred funds to himself and other entities, including: (1) $400,000 to Ryan C. Hoerauf Inc. d/b/a O'Ryan Oil and Gas, the operating company Defendant controls; (2) approximately $98,000 to Condor Pipeline, a company 50% owned by Defendant's son, Matthew Hoerauf; (3) approximately $14,000 to Tom Jaeger, his brother-in-law; (4) multiple payments on Hoerauf's personal Bank of America credit card totaling approximately $30,000; and (5) payroll payments to himself and others. These transfers were made between early to mid January and early February 2025. On February 3—the date Defendant's entities first filed bankruptcy petitions—he made additional transfers to pay personal credit card bills and a company owned by his son. Each transfer constitutes an independent act of wire fraud in furtherance of Defendant's scheme. ("PA-5," Wire Fraud).

### J. Various entities owned and controlled by Defendant filed for Chapter 11 bankruptcy protection, concealed those proceedings from Plaintiffs, and took deliberate steps to advance the Bank's position that it held a valid lien on the 58,000 PBM shares acquired by Cornerstone for $4,612,406.

94. On January 29, 2025, the Bank sent Defendant, O'Ryan LP, and related borrower entities a Notice of Disposition of Collateral (the "Disposition Notice"), stating that O'Ryan LP's obligations to the Bank were $49,869,936.17 in principal, interest, fees, expenses, and costs as of the date of the notice.

95. Regarding the PBM shares, the Disposition Notice stated that the Bank intended to dispose of the 64,000 PBM shares through an Article 9 asset sale in a public auction scheduled for February 10, 2025 at 9:00 a.m. CST. Defendant did not disclose the Disposition Notice to Plaintiffs.

96. The next day—aware that a public auction would expose his lies and misconduct—Defendant hired counsel for an emergency Chapter 11 reorganization of O'Ryan LP and affiliated entities.

97. On February 3, 2025, Defendant caused Scanrock Oil & Gas Inc. and O'Ryan Ranches Ltd., each a borrower under the Loan, to file voluntary Chapter 11 petitions. About a week later, Defendant caused six additional affiliated entities—including O'Ryan LP—followed suit. Then, on April 25, 2025, Defendant caused two more affiliated entities to file for bankruptcy. In all, ten entities filed for Chapter 11 relief (collectively, the "Debtors"). Plaintiffs did not receive notice from the Debtors of any of the filings.

98. Plaintiffs were never added to the creditor matrix or otherwise given proper notice of the bankruptcy filings, the bar date, or any critical hearings and orders. This is particularly striking given that Cornerstone had paid $4,612,406 for the 58,000 PBM shares just weeks before the petition date and was unquestionably a party in interest whose ownership of those shares was directly implicated by any proceeding purporting to challenge the validity of the Cornerstone Transaction, which Defendant and the Debtors decided during the course of the bankruptcy that they would or may do.

99. O'Ryan LP's bankruptcy schedules listed only the 6,000 retained PBM shares among its assets, acknowledging that the 58,000 shares had been validly sold to Cornerstone for

$4,612,406. Yet Defendant never informed the bankruptcy court or Cornerstone that the validity of that sale would later be challenged.

100. Defendant covertly advanced the challenge to the sale of 58,000 PBM shares through the final cash collateral order and the chapter 11 plan, securing findings and stipulations that purported to validate the Bank's alleged lien on the 58,000 PBM shares and grant the Bank significant protections and additional collateral without notice to, or participation by, Cornerstone.

101. The Bank asserted in the bankruptcy proceedings that Defendant funded the O'Ryan LP bankruptcy and the items listed below with the $4,612,406 Defendant received from Cornerstone for the sale of O'Ryan LP's 58,000 shares of PBM stock. According to the Bank, the items included: (1) a failed new drill; (2) a failed workover; (3) a huge raise to Defendant personally; and (4) a $130,000 mortgage payment for the benefit of a non-debtor insider. Ultimately, however, despite the Bank's evident misgivings about Defendant's use of certain of the funds, the Bank consented to Defendant's use of cash collateral pursuant to the terms of one or more cash collateral orders, and itself also benefitted from the proceeds.

102. On May 30, 2025, following litigation between the Bank, the Debtors, and other parties (but not Cornerstone, which was never served with the notice), the Court entered the Final Cash Collateral Order. It included a finding that "all cash or Cash Collateral in the possession, custody, or control of the Debtors were the proceeds of the…[PBM shares]…"[7] It also contained findings that the Loan was secured by the 64,000 PBM shares identified in the financing statement,[8] and Debtors' stipulation that the Purported Pledge was "legal, valid, binding, fully perfected, and nonavoidable.[9] Excluding Cornerstone from the proceedings allowed Hoerauf and

---

7 See Final Cash Collateral Order ¶ 22.

8 *Id.* ¶ E.

9 *Id.* ¶ F.

the Bank to obtain court-approved stipulations and findings affecting Cornerstone's title without the risk of Cornerstone intervening to contest them. Despite previously filing bankruptcy schedules that reflected O'Ryan LP's sale of 58,000 shares in the Cornerstone Transaction, Hoerauf subsequently caused the filing of several documents in the bankruptcy case that purported to allow the validity of the previously acknowledged sale to be challenged.

103. On July 3, 2025, Hoerauf, as controlling principal of O'Ryan LP as debtor-in-possession, caused the filing of the Debtors' Amended Joint Consolidated Plan of Reorganization, which was confirmed by the court on September 8, 2025 (the "Plan"). By the conclusion of the bankruptcy proceeding, the parties to the bankruptcy agreed in the Plan of Reorganization that the Bank would keep all of its "rights, security interests, liens, and causes of action against or related to the PBM stock included as against any transfer or proceeds thereof prior to the petition date, and [the] Bank may exercise any and all of its rights with respect to the same . . . ." Plan Section 5.6(iv). Section 4.43 of the Plan further provided that the Bank "shall retain all liens securing the Allowed [] Bank Secured Claims, including but not limited to the Prepetition Loan Liens, which liens shall survive confirmation of this Plan with the same priority, extent, and validity that otherwise exists." Defendant agreed to preserve the Bank's purported rights to the PBM shares in exchange for the Bank's support of a Plan of Reorganization that provided favorable treatment for the Debtors and his property.

104. Because Plaintiffs were never provided proper notice of the bankruptcy and that their rights could be impacted, they could not then be heard about the Bank's purported claim to the PBM shares. The use of interstate wire communications in the Chapter 11 proceedings to file a plan with these provisions and to obtain plan confirmation while deliberately excluding

Cornerstone from the proceedings constitutes wire fraud in violation of 18 U.S.C. § 1343 ("PA-6," Wire Fraud).

**K. Defendant disclosed confidential Amrize transaction information to assist the Bank at Plaintiffs' expense.**

105. After the Cornerstone Transaction closed, PBM enjoyed significant commercial success driven by several converging factors. In the first quarter of 2025, a number of significant strategic transactions occurred in the Texas aggregate and concrete sector, and the elevated cement prices that had been driven up by COVID-era supply-chain disruptions began to abate, which improved PBM's profit margins. In addition, the capital infusion from the Cornerstone Transaction allowed PBM to bring its frac sand business online, reduce its reliance on rented ready mix trucks, and grow its aggregates reserves. Later, these factors—combined with PBM's strong base business performance and large strategic players in the sector beginning to acquire companies—led to several conversations with several of these large strategic players expressing an interest in PBM. These preliminary conversations, which proved far more favorable than expected, led Cornerstone and PBM to conclude that the time was right to pursue a sale of the company.

106. In the summer of 2025, Plaintiffs hired Perella Weinberg Partners to formally engage with several large strategic players on the potential sale of PBM. After a highly competitive process, Amrize Ltd. ("Amrize") submitted a final, binding bid of $450 million. The transaction was initially structured as a stock purchase agreement under which Cornerstone and the other selling PBM shareholders would sell all of the outstanding PBM stock to Amrize.

107. Defendant remained a director during this period. On October 31, 2025, Mr. Toy emailed Defendant requesting a call to get him "up to speed on what's going on" at PBM. Defendant agreed, and on November 3, 2025, Defendant and Mr. Toy connected by telephone.

During the call, Defendant received confidential, nonpublic information about the potential acquisition of PBM by Amrize.

108. Within seven days, upon information and belief, Defendant used interstate wires to direct his counsel to disclose the pending, non-public Amrize transaction to the Bank. This gave the Bank leverage to extract additional compensation based on its purported liens over the 64,000 PBM shares. The communication caused the Bank to assert a continuing security interest that could not be resolved on the transaction timeline, forcing the deal to be restructured from a stock purchase to a merger. This wire communication was made in furtherance of the fraudulent scheme and made for the purpose of executing and furthering that scheme, in violation of 18 U.S.C. § 1343 ("PA-7," Wire Fraud).

109. Defendant's disclosure of the Amrize transaction to advance his own interests with the Bank was yet another instance of Defendant's pattern and practice of placing his personal financial interests above those of PBM, Plaintiffs, and PBM's other shareholders.

110. From the unauthorized pledge in 2018 to the sale of encumbered shares in 2024 to the elevation of the Bank's interests in the Chapter 11 proceeding, Defendant engaged in a pattern and practice and continuous course of self-interested fraud against Plaintiffs. Each act breached his fiduciary duties of loyalty and good faith and his common law obligations, and each advanced his own financial position at Plaintiffs' expense.

111. As a direct consequence of Defendant's unauthorized disclosure of the Amrize transaction to the Bank, the Bank became aware of the pending transaction and asserted that its purported lien on the PBM shares—including the 58,000 PBM shares sold to Cornerstone—entitled it to block or extract concessions from the deal.

112. The Bank's assertion of a continuing security interest—combined with the stipulations and findings from the bankruptcy proceedings, obtained without Cornerstone's knowledge or participation—created a cloud on Cornerstone's title to the 58,000 shares that could not be resolved on the Amrize transaction timeline.

113. Because Plaintiffs could not guarantee clean title to the 58,000 shares, the Amrize transaction had to be restructured from a stock sale to a merger, requiring substantial additional legal work, negotiation, and expense that would have been unnecessary but for Defendant's repeated misconduct.

114. The Amrize transaction finally closed on February 18, 2026. Due to Defendant's misconduct, Amrize reduced the aggregate merger consideration from $450 million to $422 million. The reduction in the purchase price for PBM was a direct result of Plaintiffs' and other selling shareholders' worsened negotiating position due to the cloud on title caused by O'Ryan LP's unauthorized pledge of PBM stock. As Cornerstone owned the vast majority of issued PBM shares (858,058 shares in total), it suffered most of the aggregate loss in value.

115. Defendant received a non-ratable benefit from his own breaches that was not shared by the other stockholders. His loss from the reduced merger consideration was offset by the prospect of forcing additional payments to the Bank, thereby reducing his entities' outstanding debt. By disclosing the Amrize transaction, Defendant prompted the Bank to demand a higher payoff to release its lien on the 64,000 shares—and Defendant profited from that arrangement.

116. As a condition of closing the Amrize transaction, Amrize also required the establishment of an Indemnity Escrow Account holding $24,069,636.03 in merger proceeds that would otherwise have been distributed to the selling PBM shareholders like Plaintiffs. The escrow was specifically designed to protect Amrize against any loss arising out of or relating to the

Purported Pledge, including any claim by the Bank asserting an interest in the PBM shares. This too was a direct result of the Purported Pledge and the cloud on title it created. The Indemnity Escrow Amount could not be released until either the bank delivered a full, unconditional, and irrevocable written release of the Purported Pledge and all related claims, or a final, nonappealable court order established the invalidity of the Purported Pledge and all related claims have been resolved.

117. Pursuant to Section 9.6 of the merger agreement, upon satisfaction of the aforementioned conditions, the escrowed funds were to be disbursed to the sellers' representative, first to reimburse the sellers' representative for any costs and expenses incurred in defending against the Purported Pledge claims, with any remaining balance distributed to the selling PBM shareholders in accordance with each seller's pro rata portion as defined in the merger agreement. As Cornerstone owned the vast majority of PBM's outstanding shares, the bulk of the escrowed funds—approximately $21,813,096—is attributable to Cornerstone's shares.

**L. To protect their rights to the PBM shares and challenge the Bank's purported lien, Plaintiffs initiate an adversary proceeding in the Debtors' bankruptcy proceeding.**

118. Upon discovering that Debtors had concealed developments in the bankruptcy proceedings and their consequences from Plaintiffs, Plaintiffs filed an adversary proceeding in the United States Bankruptcy Court for the Northern District of Texas styled, *Cornerstone Investment FCV LP, et al. v. Prosperity Bank, et al.*, Adv. Pro. No. 25-09033 (the "Adversary Proceeding"). The Adversary Proceeding was brought against the Bank and the Debtors and seeks various forms of relief.

119. After considerable time and expense, Plaintiffs settled with the Bank, using a portion of the escrowed funds to pay the Bank in exchange for release of the liens. The Debtors, however, did not accept responsibility for their wrongdoing. Instead, they brought and are

currently maintaining counterclaims to avoid the transfer of the 58,000 shares in the Cornerstone Transaction, brazenly seeking to invalidate the entire transaction and extract even more money from Cornerstone. The Adversary Proceeding remains pending, and Plaintiffs continue to incur substantial litigation expenses—all a result of the Defendant's actions including the Purported Pledge.

**COUNT I: BREACH OF FIDUCIARY DUTY**
**(All Plaintiffs against Defendant)**

120. The allegations in Paragraphs 1 through 119 above are incorporated by reference as if fully set forth herein.

121. As a member of the PBM Board through November 8, 2025, Defendant owed PBM and its shareholders including Cornerstone, the fiduciary duties of loyalty, good faith, and candor.

122. Defendant breached his fiduciary duties to PBM's shareholders through various acts, including but not limited to the following:

a. By using non-public, confidential information he learned as an existing director and member of PBM to advance his own negotiations with the Bank after he defaulted on the Loan; and

b. By concealing the fact and details of his Chapter 11 reorganization, which affected the 64,000 PBM shares he pledged to the Bank, including the 58,000 shares he sold to Cornerstone for $4,612,406.

123. As a direct and proximate result of these breaches, Plaintiffs suffered direct harm. Defendant's conduct ensured that the Bank's purported lien survived the bankruptcy—without Plaintiffs' involvement—and continued to cloud title through the Amrize closing, while strengthening the Bank's negotiating position at a critical stage. These harms were realized in the Amrize transaction, and the damages were borne entirely by PBM's selling shareholders like

Cornerstone, because (as described above) Defendant received a non-ratable benefit from his own breaches by extracting additional payments to the Bank from Cornerstone.

**COUNT II: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (18 U.S.C. §§ 1961-68)**
**(All Plaintiffs against Defendant)**

124. The allegations in Paragraphs 1 through 123 above are incorporated by reference as if fully set forth herein.

125. This Count is brought against Defendant Ryan C. Hoerauf, a "person" within the meaning of 18 U.S.C. § 1961(3), pursuant to the civil remedy provision of 18 U.S.C. § 1964(c), which affords any person injured in his business or property by reason of a violation of § 1962 a private right of action and entitles such person to recover threefold the damages sustained, together with the costs of suit, including reasonable attorneys' fees.

126. At all relevant times, Hoerauf was associated with an enterprise and conducted or participated in, directly and indirectly, the conduct of the enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). Hoerauf operated and managed the enterprise within the meaning of *Reves v. Ernst & Young*, 507 U.S. 170 (1993). He was not a mere employee or outside service provider; he was the controlling principal of the enterprise's constituent entities and directed every material decision throughout the scheme.

127. Throughout, Hoerauf acted with the knowledge and intent required to violate the statutes identified as racketeering activity. Hoerauf's direction and control was not incidental to the racketeering activity; it was the mechanism through which the racketeering activity was executed.

128. Hoerauf's Enterprise. Hoerauf committed a pattern of racketeering activity by participating in an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The enterprise, whose activities affected interstate and intrastate commerce, comprised at least the

following nonparty entities: (1) O'Ryan LP; (2) its general partner, Ryan E&P Management, Inc.; (3) O'Ryan Family Limited Partnership; and (4) its general partner, Ryan Properties, Inc. The enterprise operated as an ongoing organizational unit with a common purpose and an ascertainable structure separate and apart from the pattern of racketeering activity through which Hoerauf conducted certain of its affairs.

129. The enterprise's affairs, and the pattern of racketeering activity through which Hoerauf conducted those affairs, affected and were carried out through the use of interstate commerce by the commission of various predicate acts.

130. As controlling principal of both O'Ryan LP and O'Ryan Family Limited Partnership, entities capable of holding a legal or beneficial interest in property under 18 U.S.C. § 1961(3), Hoerauf associated with the enterprise and conducted and participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Specifically, he directed each of the following predicate acts of racketeering activity as defined in 18 U.S.C. § 1961(1):

**Bank Fraud (18 U.S.C. § 1344)**

131. Section 1344 prohibits knowingly executing or attempting to execute a scheme or artifice (1) to defraud a federally insured financial institution, or (2) to obtain any money, funds, or property owned by or in the custody of a federally insured financial institution by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344.

132. Hoerauf devised a scheme to defraud his creditors and Plaintiffs and furthered that fraudulent scheme by committing bank fraud against Lone Star, a federally insured financial institution. Specifically, Hoerauf caused O'Ryan LP to execute the Pledge Agreement (effective February 4, 2018) containing materially false written representations regarding the absence of transfer restrictions, defaults, and encumbrances on the PBM shares—each representation directly

contradicted by the Stockholders' Agreement—thereby fraudulently inducing the Bank to accept all 64,000 PBM shares as first-priority collateral for a $48 million loan. *See* PA-1, Statement of Facts ¶¶ 39-44.

**Wire Fraud (18 U.S.C. § 1343)**

133. Section 1343 prohibits devising or participating in any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and transmitting or causing to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce any writings, signs, signals, pictures, or sounds for the purpose of executing the scheme. 18 U.S.C. § 1343.

134. Hoerauf devised a scheme to defraud his creditors and Plaintiffs and furthered that fraudulent scheme by committing wire fraud on at least seven occasions spanning April 12, 2019, through November 10, 2025. *See, e.g.*, PA-2, Statement of Facts ¶¶ 40-42; PA-5, Statement of Facts ¶¶ 92-93; PA-7, Statement of Facts ¶¶ 106-108.

**Pattern of Racketeering Activity**

135. The seven defined predicate acts and others constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). They satisfy both the relationship and continuity requirements.

136. Relatedness. Each of these predicate acts shares the same purpose (fraudulently obtaining and preserving the economic benefit of pledging and selling PBM shares subject to Stockholders' Agreement-mandated transfer restrictions while concealing that conduct from Plaintiffs, PBM's stockholders, and ultimately the court), the same victim class (Plaintiffs and PBM's stockholders), the same methods (wire fraud and bankruptcy fraud using false representations, document filings, and interstate communications), and the same participants (principally Hoerauf, including as acting through O'Ryan LP and O'Ryan Family Limited

Partnership). The acts are accordingly related to one another and to the enterprise's affairs as required under *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989).

137. Closed-Ended Continuity. The predicate acts span more than six years—from the execution of the Pledge Agreement in February 2018 (PA-1) through Hoerauf's disclosure of the Amrize transaction in November 2025 (PA-7)—and encompass a series of distinct fraudulent acts targeting the same victim class across multiple transactions (the Pledge Agreement, the UCC filings, the conduct in connection with the Cornerstone Transaction, the proceeds diversion, and conduct in the bankruptcy proceedings). A scheme extending over a period of more than six years, involving multiple distinct acts across multiple phases, satisfies the closed-ended continuity requirement. *See H.J. Inc.*, 492 U.S. at 242.

138. As a direct and proximate result of Hoerauf's violations of 18 U.S.C. § 1962(c), both Plaintiffs and PBM's shareholders have been directly injured in their business and property. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover three times the amount of their actual damages, together with their costs of suit and reasonable attorneys' fees. As detailed further in the prayer for relief, these damages include but are not limited to: (1) loss of merger consideration in the Amrize transaction; (2) legal fees and costs incurred in restructuring the Cornerstone Transaction to accommodate Defendant's last minute decision to sell; (3) legal fees and costs incurred in restructuring the Amrize transaction from a stock purchase to a merger; and (4) legal fees and costs incurred in the Adversary Proceeding.

**COUNT III: COMMON LAW FRAUD**
**(All Plaintiffs against Defendant)**

139. The allegations in Paragraphs 1 through 138 above are incorporated by reference as if fully set forth herein.

140. Plaintiffs knew about the Transfer Restrictions in the Stockholders' Agreement that

prohibited any purported pledge of the PBM shares unless it complied with various conditions at the time they entered into the Cornerstone Transaction.

141. Defendant made false representations and/or concealed material facts regarding: (1) O'Ryan LP's Purported Pledge of 64,000 PBM shares to the Bank; (2) the Loan and Pledge Agreement secured by those shares; (3) the Purported Pledge's violation of the Stockholders' Agreement; (4) Defendant's default under the Loan at the time he sold 58,000 shares to Cornerstone for $4,612,406; and (5) the Bank's notice to Defendant that it intended to exercise its rights over his collateral, including the 58,000 shares he was selling to Cornerstone.

142. Defendant knew or believed the representations were false and the omissions material, or was recklessly indifferent to the truth of the representations or wrongfulness of the omission of this information.

143. Defendant intended Cornerstone to act by paying him $4,612,406 for 58,000 of O'Ryan LP's PBM shares and allowing O'Ryan LP to retain the remaining 6,000 PBM shares.

144. Cornerstone acted in justifiable reliance on Defendant's ability to sell 58,000 shares to Cornerstone and retain 6,000 shares of PBM stock, both free and clear of encumbrances to the title of the stock.

145. Cornerstone and its shareholders were injured by their reliance.

**COUNT IV: CIVIL CONSPIRACY TO COMMIT FRAUD**
**(All Plaintiffs against Defendant)**

146. The allegations in Paragraphs 1 through 145 above are incorporated by reference as if fully set forth herein.

147. Defendant acted in combination or confederation with O'Ryan LP, O'Ryan Family Limited Partnership, and other persons including other entities he owned and controlled to defraud Cornerstone and PBM's other shareholders. He used these persons as instruments of a coordinated

scheme to: (i) conceal the Purported Pledge before and after the December 2024 sale of the 58,000 shares; (ii) divert or attempt to divert sale proceeds away from the Bank in violation of the Pledge Agreement; and (iii) exclude Plaintiffs from the bankruptcy proceedings so the Bank's purported lien would survive.

148. Defendant acted at all relevant times pursuant to personal motives rather than strictly in furtherance of any legitimate corporate purpose of his entities. Specifically, Hoerauf used sale proceeds from the Cornerstone Transaction to advance Defendant's personal financial interests and to discharge personal financial obligations, among other things.

149. In furtherance of their conspiracy, Defendant, O'Ryan LP, O'Ryan Family Limited Partnership, and the various entities that Defendant owned and controlled committed, among others, the following unlawful acts:

(a) Defendant, acting individually and through O'Ryan LP, fraudulently concealed the Purported Pledge from Cornerstone at the time of the December 2024 sale of the 58,000 PBM shares, inducing Cornerstone to pay $4,612,406 for shares encumbered by the Bank's undisclosed purported lien;

(b) Defendant, acting individually and through O'Ryan LP, sold the 58,000 PBM shares to Cornerstone without disclosing that he was in default on the Loan, that the Bank had issued a formal notice of default, and that the Bank had advised him of its intent to foreclose on the 64,000 shares pledged as collateral;

(c) Defendant, acting individually and through O'Ryan LP, deliberately routed the $4,612,406 in sale proceeds to a separate account controlled by O'Ryan Family Limited Partnership, in direct violation of the Pledge Agreement, in an effort to prevent the Bank from discovering Cornerstone's involvement and to divert proceeds so they could be used

as he wished;

(d) Defendant, acting through O'Ryan LP, O'Ryan Family Limited Partnership and related entities, filed voluntary petitions for bankruptcy relief in early 2025 and actively worked to ensure that none of the Plaintiffs was added to the creditor matrix or provided proper notice of the bankruptcy filings, the critical hearings, or the orders entered in the Chapter 11 cases, notwithstanding Cornerstone's payment of $4,612,406 only weeks before; and

(e) Defendant, exploiting his position as a director of PBM, directed disclosure of confidential details of the Amrize transaction to the Bank without authorization from PBM's shareholders, in furtherance of his own interests and at Plaintiffs' expense during active sale negotiations.

150. As a direct and proximate result of the Defendant and his entities' unlawful acts, Plaintiffs suffered actual damages.

**COUNT V: VIOLATION OF STATE SECURITIES LAWS**
**Texas Securities Act §§ 4008.052, 4008.055**
**(Cornerstone against Defendant)**

151. The allegations in Paragraphs 1 through 150 above are incorporated by reference as if fully set forth herein.

152. Defendant, who directly or indirectly controlled seller O'Ryan LP, made material misstatements and/or omitted material facts regarding: (1) the Pledge Agreement pledging all 64,000 PBM shares as Loan collateral; (2) his default under the matured Loan; (3) the December 2, 2024 forbearance agreement and its cancellation on December 17, 2024; (4) the Bank's notice of intent to foreclose on his collateral, including the 58,000 shares sold to Cornerstone for $4,612,406; (5) his direction of sale proceeds to an account unknown to the Bank, in violation of his agreements with the Bank; and (6) his intent to use the proceeds in part to fund a Chapter 11

proceeding that would further impair Cornerstone's title to the 58,000 shares it purchased.

153. Each of the foregoing omissions concerned a fact that a reasonable investor would consider important in deciding whether to purchase PBM shares. No reasonable purchaser would have paid $4,612,406 for shares encumbered by an approximately $50 million bank lien where the pledging party was in sustained default, had failed to satisfy the conditions of a forbearance agreement entered into days before closing, and could face imminent foreclosure on the pledged shares.

154. Defendant acted with scienter in making misstatements about or omitting material facts with respect to the items set forth above.

155. Each of the material misstatements and omissions set forth above were in connection with the sale of the 58,000 shares of PBM stock to Cornerstone for $4,612,406.

156. The PBM stock was a security as defined under applicable state securities laws.

157. Cornerstone relied upon the material misstatements and/or material omissions set forth above in deciding to purchase the 58,000 shares of PBM stock from O'Ryan LP for $4,612,406.

158. Cornerstone's reliance on the material misstatements and/or material omissions was the direct and proximate cause of its injuries, including the purchase of 58,000 shares encumbered by an undisclosed bank lien and the resulting harm suffered by Cornerstone in connection with the Amrize transaction.

159. As a direct and proximate result of these violations of state securities laws, Cornerstone suffered damages.

## COUNT VI: UNJUST ENRICHMENT
**(Cornerstone Against Defendant)**

160. The allegations in Paragraphs 1 through 159 above are incorporated by reference as if fully set forth herein.

161. Cornerstone pleads this Count in the alternative to Counts I through V. To the extent that any of Plaintiffs' other claims provide an adequate remedy at law, Plaintiffs assert unjust enrichment as an alternative basis for recovery.

162. Defendant received a benefit when he collected $4,612,406 from Cornerstone from the sale of 58,000 shares of PBM stock.

163. Defendant directed the proceeds of the PBM stock sale he received from Cornerstone to be transmitted to the O'Ryan Family Limited Partnership rather than to O'Ryan LP, the seller of the shares.

164. Defendant caused the funds to first be transferred into a Charles Schwab account and then into a newly opened VeraBank account.

165. Defendant then used the proceeds to, among other things, finance the Chapter 11 filing and to pay himself and related parties including: (1) $400,000 to Ryan C. Hoerauf Inc. d/b/a O'Ryan Oil and Gas, the operating company Defendant controls; (2) approximately $98,000 to Condor Pipeline, a company 50% owned by Defendant's son, Matthew Hoerauf; (3) approximately $14,000 to Tom Jaeger, his brother-in-law; (4) multiple payments on Hoerauf's personal Bank of America credit card totaling approximately $30,000; and (5) payroll payments to himself and others.

166. Cornerstone suffered a corresponding detriment: it paid $4,612,406 but did not receive shares with clear title. Instead, the 58,000 shares were subject to the Purported Pledge, which prevented the Amrize transaction from proceeding on the anticipated terms.

167. Defendant's enrichment was directly related to Cornerstone's impoverishment because Defendant should not have received $4,612,406 for shares on which he knowingly permitted an undisclosed lien to exist.

168. Defendant's enrichment was further related to Cornerstone's impoverishment because he directed the proceeds to an account outside the Bank's control, initially concealing them from the Bank.

169. By directing the funds to an account outside the Bank's immediate control—in violation of his agreements—Defendant deprived the Bank of the opportunity to immediately accept $4,612,406 in exchange for releasing its lien on the 58,000 shares.

170. There is no legal or equitable justification for Defendant's retention of the $4,612,406 from the sale of the 58,000 shares of PBM stock sold by O'Ryan LP when, unbeknownst to Cornerstone, Defendant's secret pledge of the PBM stock caused Cornerstone to purchase encumbered shares in PBM.

171. Accordingly, and as an alternative to Counts I through V, Cornerstone is entitled to disgorge all profits, gains, and other benefits realized by Defendant as a result of his unjust enrichment, including but not limited to any income, proceeds, returns, or other consideration earned, received, or derived from the wrongfully obtained benefit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the entry of judgment by the Court awarding:

1. Compensatory damages in an amount to be determined at trial, including:

   a. the diminution in the consideration received by Plaintiffs resulting from Defendant's encumbrance of the 64,000 shares, including the reduction in PBM's enterprise value that Amrize negotiated as a result of Plaintiffs' inability to deliver clean title to all of PBM's shares;

b. the remaining portion of the amount withheld from Plaintiffs and placed in escrow by the buyer in connection with the cloud on title to the 64,000 PBM shares;

c. all legal fees and transaction costs incurred in connection with restructuring the Cornerstone Transaction to accommodate Defendant's last-minute decision to sell 58,000 PBM shares;

d. all legal fees and transaction costs incurred in restructuring the Amrize transaction from a stock purchase to a merger as a result of the encumbrance on O'Ryan LP's PBM shares;

e. all legal costs and expenses incurred in connection with the Adversary Proceeding; and

f. all costs and expenses incurred by Plaintiffs in clearing the encumbrance on the 64,000 PBM shares as required by the terms of the Amrize transaction.

2. Three times the amount of Plaintiffs' actual damages pursuant to Count II.

3. Pre-judgment and post-judgment interest at the applicable rate.

4. Attorneys' fees and costs to the extent permitted by applicable law.

5. In the alternative, and to the extent the Court finds that Plaintiffs lack an adequate remedy at law with respect to any of the claims asserted above, judgment in favor of Cornerstone under Count VI for unjust enrichment, including restitution and disgorgement of the $4,612,406 in sale proceeds Defendant received from Cornerstone in connection with the purchase of the 58,000 PBM shares, together with pre-judgment interest thereon at the applicable rate from the date of receipt.

6. Such other and further relief as the Court deems just and proper.

MORRIS, NICHOLS, ARSHT
& TUNNELL LLP

/s/ *Kevin M. Coen*
Kevin M. Coen (#4775)
Jialu Zou (#7478)
Adam C. Perri (#7641)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
(302) 658-9200
kcoen@morrisnichols.com
jzou@morrisnichols.com
aperri@morrisnichols.com

*Attorneys for Plaintiffs Cornerstone Investment FCV LP, Cornerstone Investment GP LLC, and BPGC Management, L.P.*

OF COUNSEL:

Gary R. Silverman
Carolyn Gurland
WHITE & CASE
300 N. LaSalle Drive
Chicago, IL 60654
(312) 881-5400
gary.silverman@whitecase.com
carolyn.gurland@whitecase.com

Ryan Ulloa
WHITE & CASE
Southeast Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131
(305) 371-2700
rulloa@whitecase.com

Dated: August 19, 2026